IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| ERICA M. SMITH, | |
|---|---|
| Plaintiff, | 8:18-CV-240 |
| vs. | |
| ANDREW M. SAUL,[1] Commissioner of the Social Security Administration, | MEMORANDUM AND ORDER |
| Defendant. | |

Erica Smith appeals from the denials, initially and upon reconsideration, of her applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental social security income benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq*. The Court has considered the parties' filings and the administrative record and reverses the Commissioner's decision.

## PROCEDURAL HISTORY

In February 2015, Smith applied for disability insurance benefits under Title II and supplemental security income benefits under Title XVI. T201-02. Both claims were denied initially and on reconsideration. T1-6. Following a hearing, the administrative law judge (ALJ) found that Smith was not disabled as defined under 42 U.S.C. §§ 223(d) or 1614(a)(3)(A), and therefore, not entitled to benefits under the Social Security Act. T19-21. The Appeals Council of the Social Security Administration denied Smith's request for review of the ALJ's decision. T11. Accordingly, Smith's complaint seeks review of the ALJ's

---

[1] Andrew M. Saul is now the Commissioner of Social Security and will be automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

decision as the final decision of the Commissioner under 42 U.S.C. § 405(g). Filing 1.

FACTUAL BACKGROUND

I. MEDICAL AND WORK HISTORY

From 2000 until February 2015, Smith held various administrative positions with the Federal Reserve and First National Bank. T52-56; T220. In early 2014, however, Smith began having issues with her back. So, on March 18, 2014, Smith underwent lumbar fusion surgery. T40-50; T56-60; T304; T316. Although this procedure went well, Smith had problems with her surgical incision healing. In particular, Smith developed a tissue ulceration and experienced a severe infection around her incision area. T349; 424. These healing issues required additional surgeries to sterilize, irrigate, and close Smith's lumbar incision. T356-57; 360.

But by early September 2014, Smith appeared to be on the mend: her surgical incision had finally healed and she was able to return to work with "minimal restrictions."[2] *See* TR 461-62. At this time, Smith's surgeon, Dr. Ric Jensen, noted that Smith was "progressing well" and "her pre-operative back pain has improved significantly . . . ." *See* T461. Dr. Jensen also found that Smith had "no focal radicular leg symptoms" and "[h]er lower extremity neurological examination is normal at this juncture." T461.

Unfortunately, Smith's relief was temporary. A few weeks later, Smith began experiencing severe pain, numbness, and tingling in her hand and wrist. T463, 468-70, 585. Smith had previously been diagnosed with bilateral carpal tunnel, ulnar neuritis, and De Quervain's syndrome, which each contributed to these problems. T424-27; 439-40. Then, in late September 2014, Smith also

---

[2] The Court notes that while she was healing, Smith claims that she was unable to work full-time. T57-58.

began complaining of post-surgery back pain. A follow-up CT scan showed "peripherally calcified soft tissue protrusion into the central canal at L5-S1 producing mild central canal narrowing" and [m]ild left foraminal narrowing" at the L4-L5 and L5-S1 levels, and an EMG study showed likely "acute on chronic S1 radiculopathy on the left." T405-06; T386.

Together, these problems made it difficult for Smith to sit or stand for long periods of time. And Smith also noted that it was not easy for her to type and write for customers, and she needed more time each day to "lie down because of the pain." T248; *see also* T57. Given these health issues, on February 6, 2015, Smith stopped working and applied for Social Security benefits. T228.

On February 9, 2015, Smith was also diagnosed with fibromyalgia. *See* T513-15. At this point, her primary care physician, Dr. Joseph Shehan, M.D., suspected that Smith might also have some sort of connective tissue disease, although that diagnosis was not proven. *See* T513. And on April 13, 2015, Smith was evaluated by Dr. Shehan after she complained of continued "weakness and numbness" in her lower extremities. T542. At this time, Dr. Shehan also noted that Smith had experienced "neuropathy in the past." T542.

Over the next several months, Smith's leg pain continued. Specifically, Smith's medical records indicate that she was experiencing "severe pain involving her right lower leg to the point where she can barely walk" and her left knee was buckling frequently. T563. Given her persistent pain issues, Dr. Shehan, recommended that Smith receive a second opinion. T579.

So, on May 2, 2016, Smith was seen by Dr. Harry Klein, M.D., a board certified rheumatologist. T670. During this visit, Dr. Klein noted tenderness, swelling, and tender points as a result of Smith's fibromyalgia in her extremities. T670. Dr. Klein concluded that he "cannot definitively give a diagnosis of an autoimmune condition" but opined that Smith "may have an

undifferentiated [connective tissue disease] that has not differentiated." T672. As a result, Dr. Klein noted that Smith may require further monitoring. T672.

But Smith's symptoms did not improve. And by March 2017, Smith had experienced "2-3 weeks of severe numbness in the lower extremities to the point where she can barely stand." T701. Because of this numbness, Smith reported using a walker for ambulation. T701. Smith also noted that she had "severe pain involving the back shooting down." T701. So, Smith underwent an EMG, nerve condition velocity, and an MRI scan. That MRI revealed "mild dehydration of the T11-12 disc with a small posterior central disc protrusion" but also revealed "no central canal or neural foraminal stenosis." T699.

## II. ADMINISTRATIVE HEARING

At the time of the administrative hearing in April 21, 2017, Smith generally testified consistent with her medical records. T64. More specifically, Smith said that in the years after her back surgery, she was forced to recline for four to six hours a day to "relieve some of the pain from [her] lower half." T62. Smith also testified that she was only able to sit or stand for 10 or 15 minutes at a time because her pain is a "constant eight at all times." T62-64. Relatedly, Smith said that when she walked her legs would often go numb causing her to trip and fall or, at the very least, requiring the use of a walker to ambulate. T61-63. And not only did Smith have problems with her lower extremities, she also had difficulties performing tasks with her hands as a result of the pain and numbness she experienced in her fingers and wrists. T57, 68.

In addition to testimony from Smith, the ALJ heard testimony from a vocational expert (VE). Specifically, the ALJ presented the VE, Ms. Dedderman, with a hypothetical regarding whether an individual who was limited to sedentary exertion but could perform no more than occasional

4

balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs, and could perform more than occasional fingering, feeling or handling with the right dominant extremity, among other limitations, could perform any jobs in significant numbers in the national economy. 81-83. The VE opined that such a person could get work as a call out operator and surveillance system monitor. T83.

The ALJ then asked the VE a second hypothetical: whether in addition to the limitations in hypothetical one, if an individual could not stand or sit for more than ten minutes uninterrupted, could that person still work as a call out operator or surveillance system monitor? T84. In response to that additional condition, the VE opined that in her knowledge, experience, and training in the field of vocational rehabilitation, such an individual would not be able to perform any jobs in significant numbers in the national economy. T83-84.

The ALJ then posed a third hypothetical: whether an individual with the same limitations as hypothetical one, but who would also be absent three or more times a month to manage the conditions, would be able to gain meaningful employment. Similar to her response to hypothetical two, the VE opined that an individual with that additional condition would not be able to perform any jobs in significant numbers in the national economy. T83-84.

### III. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Smith alleged that she has been disabled since February 1, 2015—the date she was forced to quit working because of her pain issues. But the ALJ found that Smith could gain meaningful employment. To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

5

(A) STEP ONE

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i). In this case, the ALJ found that Smith had not engaged in substantial gainful activity since her alleged disability onset date of February 1, 2015. T24

(B) STEPS TWO AND THREE

The ALJ then moved on to step two. At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

The ALJ found that Smith has the following severe impairments: degenerative disc disease of the lumbar spine, status post fusion and debridement; fibromyalgia; diabetes mellitus with neuropathy; migraine headaches; bilateral carpal tunnel syndrome and de Quervain's syndrome; obesity; and obstructive sleep apnea/asthma. T25. But, the ALJ found that

Smith's impairments, considered singly and in combination, did not meet or medically equal a presumptively disabling listed impairment. T25-26.

The ALJ explained, more specifically, that the medical evidence "does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis" required. T26. The ALJ also noted that there is no evidence that Smith's back disorder resulted in the inability to ambulate. T25. Nor was there evidence, the ALJ said, of "disorganization of motor function in two extremities resulting in the extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities." T26. And finally, the ALJ noted that there was no evidence that Smith's fibromyalgia medically equals a listing. T26. Accordingly, the ALJ then proceeded to determining Smith's residual functional capacity.

(C) RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. §§ 404.1520(a)(4), 404.1250(e). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales,* 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ

7

then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[3] and "other evidence."[4] 20 C.F.R. § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4).

The ALJ found that although Smith's impairments could reasonably be expected to produce her symptoms, Smith's statements "concerning the intensity, persistence and limiting effects of these systems are not entirely consistent with the medical evidence and other evidence in the record." T28. In reaching this decision, the ALJ found, that the fact that Smith was released with minimal work restrictions after her lumbar surgery and that a 2017 MRI suggested no stenosis "undercuts both the claimant's testimony as well as the opinion of her treating physician that she is unable to work on a full-time, consistent basis." T31.

---

[3] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[4] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

8

Instead, based on the opinions of the state agency's medical consultants, the ALJ determined that Smith

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is able to occasionally balance, stoop, kneel, crouch, and crawl; is able to occasionally climb ramps and stairs; can never climb ladders, ropes, and scaffolds; never be exposed to hazards such as moving mechanical parts or unprotected heights; never engage in commercial driving; can occasionally be exposed to vibrations, temperature extremes, and atmospheric conditions such as dust, odors, gases or fumes; can occasionally push and pull, operate foot controls with the lower extremities; can occasionally finger, feel, and handle with the right upper extremity; and frequently finger, feel, and handle with the left upper extremity.

T27.

### (D) STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales,* 465 F.3d at 894; 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1250(f). If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales,* 465 F.3d at 894; 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

Here, the ALJ determined Smith is unable to perform past relevant work. T33. And at step five, the ALJ found that Smith could perform jobs that existed in significant numbers in the national economy, based on the testimony of the VE. T34. Specifically, the ALJ provided Smith could work as a call out operator or a surveillance system monitor. T234. So, the ALJ found Smith was not disabled, and denied her claims for benefits. T28.

STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011)

## ANALYSIS

### 1. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE DECISION.

Smith argues that the ALJ's decision is not supported by substantial evidence. Filing 12-1 at 11. Specifically, Smith contends that the ALJ erred in evaluating Smith's residual functional capacity because the ALJ did not provide good reasons for the weight (or lack thereof) given to Smith's treating physician. Filing 12-1 at 11. "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2015). An ALJ is required to give controlling weight to the opinions of treating doctors when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014).

Here Smith argues, and the Court agrees, that the ALJ erred by not giving controlling weight to the opinion of Smith's treating physician, Dr. Joseph F. Shehan, M.D. T32; filing 12-1 at 11. In doing so, the ALJ concluded that although Smith's medically determinable impairments could reasonably be expected to produce the symptoms Smith described, the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." T28. Based on that conclusion, the ALJ ignored, or at the very least minimized, Dr. Shehan's statement that he "believe[s] it would be difficult for [Smith] to work and [sic] 8-hour work day, 5 days a week . . . ." and that Smith would likely miss "3 or more days per month" when the ALJ made his determination on Smith's residual functional capacity. T697.

In justifying why Dr. Shehan's statement should be discredited, the ALJ primarily focused on three pieces of evidence: (1) the opinion of the state agency medical consultants, (2) the fact that Smith was, at least initially, progressing well and was able to return to work with "minimal work restrictions," and (3) Smith's most recent MRI results—which revealed "no stenosis." T30-33. But there are several problems with the ALJ's reliance on that evidence to discredit the opinion of Smith's treating physician. T697.

To begin, the ALJ gave too much weight to the opinions of the nontreating, nonexamining state medical consultants. *See Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003). Based on the testimony of the state medical consultants, the ALJ determined that Smith could, among other things, lift 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour work day, and can occasionally push and pull, operate foot controls with the lower extremities, occasionally finger, feel, and handle with the right upper extremity, and frequently finger, feel, and handle with the left upper extremity. T27, T32.

But the medical consultants only reviewed Smith's medical records through July 2015. T32. That means nearly two years of medical evidence were not considered by the sources that the ALJ primarily relied on.[5] For example, the state medical consultants did not consider Smith's January 2016 visit to the rheumatologist, Dr. Klein. T670. And during that visit, Dr. Klein opined that Smith "may have an undifferentiated [connective tissue disease] that has

---

[5] The Court notes that the ALJ did find that Smith had additional functional limitations regarding her upper extremities. T33. But as discussed in more detail below, an ALJ may not draw his own inferences about Smith's functional ability from the medical reports. *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017).

not differentiated." T672. Nor did the consultants take into consideration the severe pain and numbness issues that Smith began experiencing in November 2015. T563. Or that by March 2017, Smith had experienced "2-3 weeks of severe numbness in the lower extremities to the point where she can barely stand." T701. And if they had, the medical consultants would have been aware that Smith's medical records reflect that she was required to use a walker for ambulation, and that Smith had "severe pain involving the back shooting down." T701.

The medical consultants also were not able to consider the evidence in the record that given Smith's persistent pain issues, Smith was required to undergo an EMG, nerve condition velocity, and an MRI scan. T701. Based on this evidence, it's difficult to imagine a scenario where the medical consultants, who did not even have Smith's complete medical record, should be given more weight than Smith's treating physician—who made his determination of Smith's functional capacity based on Smith's entire medical history, and personally examined and treated Smith. *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010); *Shontos,* 328 F.3d at 427.

Second, the ALJ placed improper weight on Dr. Jensen's September 9, 2014 status update indicating that Smith was "progressing well" and that she could return to work with "minimal work restrictions." T461; T33. As the Eighth Circuit has made clear, a comment in a medical record that a claimant was doing well for the purposes of treatment "has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity." *Nowling v. Colvin,* 813 F.3d 1110, 1123 (8th Cir. 2016); *see also Hutsell v. Massanari,* 259 F.3d 707, 713 (8th Cir. 2001). And even if it did, the record evidence demonstrates that after this observation, a subsequent CT scan showed "peripherally calcified soft tissue protrusion into the central canal at L5-S1

13

producing mild central canal narrowing" and "mild left foraminal narrowing" at the L4-L5 and L5-S1 levels and an EMG study showed likely "acute on chronic S1 radiculopathy on the left." TR 405-06. Smith's medical records also evince multiple instances, as discussed in the paragraph above, where Smith sought treatment for pain and numbness in the years following Dr. Jensen's report. T699. Simply put, the mere fact that nearly three years before Dr. Shehan issued his treating source statement, and months before Smith's alleged onset date, one of Smith's medical records reflect that she was "progressing well" and could return to work with "minimal restrictions," fails to satisfy the regulations' "require[ment] that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." *Id.* (quoting *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005); *see also* 20 C.F.R. § 404.1527(d)(2)).

Finally, the ALJ determined that based on Smith's March 23, 2017, MRI—which showed no stenosis or significant lumbar changes, T699—Smith's symptoms were not, and could not, be consistent with the medical records. But an ALJ may not draw his own inferences about Smith's functional ability from the medical reports. *Combs*, 878 F.3d at 645-46; *see also Shontos*, 328 F.3d at 427; *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975). And there is nothing in the record to suggest that any medical source or treating physician read that MRI as being inconsistent with the severity or intensity of Smith's symptoms.

So, in sum, the Court finds that the ALJ did not have an adequate reason to discount the opinion of Smith's treating physician, Dr. Shehan. *See Nowling*, 813 F.3d at 1123. That opinion should have been afforded the same, if not greater weight, than those of the nontreating, nonexamining consultants. *Vossen*, 612 F.3d at 1016; *Shontos*, 328 F.3d at 427. On remand, the ALJ should

14

reconsider the weight given to Smith's treating physician when evaluating Smith's residual functional capacity. *See Vossen*, 612 F.3d at 1016.

2. VOCATIONAL EXPERT

Smith also takes issue with the ALJ's reliance on the VE's claim that a surveillance system monitor has approximately 5,000 positions available nationwide. Filing 12-1 at 8. According to Smith, many of the 5,000 monitoring positions available are actually more demanding than the VE recognized. T292. Specifically, Smith alleges that many of those positions now require longer training, higher aptitudes, and greater physical demands. T292. Because of this contention, Smith's counsel asked to submit written interrogatories to inquire into the number of jobs available in the national economy for the surveillance system monitor positions. T292. The ALJ, however, denied the request of counsel to further examine the VE through written interrogatories.

But as the Supreme Court recently made clear, the ALJ's refusal of a request for additional data is not categorically inadequate. *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). In some cases, "the refusal to disclose data, considered along with other shortcomings, will undercut an expert's credibility and prevent a court from finding that a reasonable mind could accept the expert's testimony." *Id.* But in other cases, the refusal will not. *Id.* That means "[t]he inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." So, on remand, the ALJ should reconsider Smith's request for

additional interrogatories taking "into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Id.*

### 3. APPOINTMENTS CLAUSE.

Smith raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC,* 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner.[6] Consistent with *Lucia,* Smith asks that this matter be remanded and that a different ALJ be assigned to determine his claim for benefits.[7] In response, the Commissioner does not dispute (but also does not concede) that Social Security ALJs are inferior officers as opposed to agency employees. Filing 16 at 11. Instead, the Commissioner argues that Smith waived any claim pursuant to the Appointments Clause by not timely raising the issue at the hearing before the ALJ or to the Appeals Council. Filing 16 at 11.

Appointments Clause challenges are deemed to be "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.,* 501

---

[6] The Appointments Clause provides, in pertinent part, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II § 2, cl. 2.

[7] In *Lucia,* the matter was remanded for a new hearing before a different fact-finder. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Lucia,* 138 S. Ct. at 2055.

16

U.S. 868, 879-80 (1991). On remand, Smith may raise a challenge to the ALJ's appointment if she so elects. It will be up to the Commissioner whether to have the previous ALJ preside, or whether it would be prudent to assign a different ALJ and avoid any later challenge that may arise pursuant to *Lucia*.

CONCLUSION

There is not substantial evidence on the record as a whole supporting the ALJ's denial of benefits. This matter must be remanded for reconsideration consistent with this Memorandum and Order.

IT IS ORDERED:

1. The Clerk of the Court is directed to substitute Commissioner of Social Security Andrew M. Saul as the defendant.

2. Smith's motion for reversal of the Commissioner's final decision (filing 12) is granted.

3. The Commissioner's motion to affirm the Commissioner's final decision (filing 15) is denied.

4. The Commissioner's decision is reversed.

5. This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Court's Memorandum and Order.

6. A separate judgment will be entered.

Dated this 5th day of July, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge